UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:   14-61761-CIV-GAYLES/TURNOFF

JEAN MARIE CHARLES,

        Claimant,

vs.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Claimant Jean Marie Charles' (hereinafter, "Claimant") Motion for Summary Judgment **(ECF No. 24)**, Defendant Carolyn W. Colvin's (hereinafter, "Defendant") Motion for Summary Judgment **(ECF No. 25)**, and a prior Order of Referral entered by the Honorable Darrin P. Gayles. **(ECF No. 2).**

It is important to note at the outset that Claimant is proceeding as a *pro se* litigant. Generally, *pro se* pleadings are held to less stringent standards than formal pleadings drafted by lawyers. Wilkerson v. Georgia, 618 F. App'x. 610, 612 (11th Cir. 2015). This liberal construction, however, does not give courts a license to serve as *de facto* counsel and re-write deficient pleadings in order to maintain a cause of action. See Giles v. Wal-Mart Distribution Ctr., 359 F. App'x. 91, 93 (11th Cir. 2009). Here, viewing Claimant's Complaint in the light most favorable to him, it appears that he is appealing Defendant's denial of his application for supplemental security income/ disability benefits.

Upon review of the Motions, the Responses, the administrative record, the court file, and being otherwise duly advised in the premises, the undersigned makes the following findings.

## Background

Claimant submitted an application for disability benefits on February 15, 2008, alleging a disability onset date of July 16, 2004.[1]  **(Tr. 23-24)**.[2] At the same time, he also filed an application for supplemental security income.  **(Tr. 24)**.  His claims were denied on June 4, 2008, and upon reconsideration on October 2, 2009. **(Tr. 74)**.  Claimant filed a written request for a hearing on November 3, 2008.  Id.  The request was granted and a hearing was held on August 11, 2009.  Id.  On November 23, 2009, the Administrative Law Judge (hereinafter, "ALJ") entered an unfavorable decision.  **(Tr. 85)**.  Thereafter, Claimant appealed to the Appeals Council.  **(Tr. 92)**. On May 26, 2011, the Appeals Council vacated the hearing decision and remanded the claim for further resolution of specific medical and vocational issues.  Id. Specifically, the Appeals Council directed the ALJ to do the following:

> [G]ive further consideration to the claimant's medically determined obesity under Social Security Ruling 02-1p. Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Rulings 85-16 and 96-8p). In so doing, evaluate any treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. Obtain evidence from a vocational expert to clarify the demands of the claimant's past relevant work and/or the effect of the assessed limitations on the claimant's occupational base (20 CFR 404.1560(b)(2) and 416.960(b)(2) and Social Security Rulings 82 62, 83 14 and 85 15). The hypothetical question should reflect the specific capacity/limitations established by the record as a whole. As appropriate, the Administrative Law Judge will ask the vocational expert to identify examples of

---

[1] Claimant was forty-three (43) years old at the time of his alleged disability onset. **(Tr. 22)**.
[2] For purposes of this Report and Recommendation, all references to the administrative record shall be cited as "Tr." The administrative record is located at **(ECF No. 20)**.

appropriate jobs and to state the incidence of such jobs in the national economy (20 CF 303.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and the Selected Characteristics of Occupations (Social Security Ruling 00 40p). In compliance with the above, the Administrative Law Judge will offer the claimant an opportunity for a hearing, and take any further action needed to complete the administrative record and issue a new decision.

**(Tr. 93)**.

Upon remand, a hearing was scheduled for February 27, 2012. **(Tr. 12)**. Claimant appeared with counsel and testified at the hearing. Id. Impartial vocational expert Gary R. Fannin (hereinafter, "VE") also testified. Id. Shortly thereafter, on July 13, 2012, the ALJ again entered an unfavorable decision. **(Tr. 24)**. Claimant requested further review. **(Tr. 8)**. Same was denied. **(Tr. 1)**. This action followed. **(ECF No. 1)**.

Claimant was fifty-one (51) years old at the time of the ALJ's decision. **(Tr. 22)**. He has a high school education. **(ECF No. 1)**. He has previously worked as a commercial industrial cleaner and as a dishwasher. **(Tr. 22)**. At the hearing, he indicated that he needed a translator. However, he is, in fact, able to communicate in English, as he responded in English to the ALJ's questions. **(Tr. 21)**.

### Medical Evidence

By way of summary, the record indicates that Claimant has the following ailments: degenerative disc disease of the lumbar and cervical spine, herniated discs of the lumbar and cervical spine, diabetes mellitus, erectile dysfunction, brittle toenails, carpal tunnel syndrome, hypertension, obesity, and ulnar neuropathy. The following is a summary of the medical records in the administrative file.

<u>Scott S. Foster, D.C. - Chiropractor</u>

On September 3, 1999, Claimant began physical therapy following a motor vehicle accident on September 1, 1999. **(Tr. 285)**.   He complained of headaches, neck pain, left wrist pain, and lower back pain that radiated to his left leg. <u>Id.</u>

His range of motion (cervical) was restricted and painful on flexion.  **(Tr. 311)**.   His straight leg tested bilaterally at seventy (70) degrees with central pain, and muscle spasms. **(Tr. 286)**.  His lumbar spine range of motion was also restricted and painful on flexion, extension, and right and left lateral flexion.  <u>Id.</u>  Dr. Foster found that Claimant had sustained five (5) percent partial impairment of his body as a result of the accident.  <u>Id.</u>

He diagnosed Claimant with cervical radiculopathy with disc herniation at discs C5-C6, lumbar radiculopathy with herniation at  L5-S1, spondylolisthesis, and cervical spondylosis. **(Tr. 287)**.  He recommended a posterior L5/S1 discectomy, laminectomies, and pedicle screw fixation and fusion.  <u>Id.</u>  Claimant was hesitant to undergo surgery. <u>Id.</u>

<u>Luis A. Escobar, M.D. - Pain Management Specialist</u>

Claimant sought pain management following a work related injury on January 26, 2004. He claims that he fell and hit his backside on a golf cart. **(Tr. 256)**.  He complained of radiating back pain.  <u>Id.</u>  Dr. Escobar diagnosed him with spondylolisthesis and lower back pain with bilateral lumbar radiculitis.  **(Tr. 257)**.  He ordered an MRI and recommended epidural steroid injections. <u>Id.</u>

An MRI dated May 27, 2005, showed no significant disc bulge or disc herniation at L4-L5 or L3-L4; however, it did show the presence of degenerative disc disease at L1-L2.  **(Tr. 253)**. In addition, a Grade I spondylolisthesis was observed and diffusion at the L5-S1 level was noted. **(Tr. 254)**.  Claimant was treated with epidural injections several times in 2005. **(Tr. 258)**.

The records also show that he was involved in a motor vehicle accident and suffered an injury to his face that resulted in infection. **(Tr. 267)**. He was treated with antibiotics. The accident did not aggravate his lumbar symptoms. Id. Dr. Escobar diagnosed him with degenerative disc disease of the lumbar spine. **(Tr. 258)**.

Kenneth L. Jarolem, M.D. - Orthopedic Spinal Surgeon

On March 12, 2004, following a slip and fall injury,[3] Claimant began to see Dr. Kenneth L. Jarolem, an orthopedic spinal surgeon. **(Tr. 275)**. He complained of severe lower back pain. Id. He presented with diffused lumbosacral. Id. He was diagnosed with spondylolisthesis. **(Tr. 276)**. Physical therapy was recommended. **(Tr. 273-74)**.

In 2004, Claimant reported no significant changes in pain and claimed that he had not improved with therapy. **(Tr. 271-72)**. On September 9, 2005, Dr. Jarolem concluded that Claimant had a four (4) percent impairment of his body as a whole. Id.

Paul A. Martinez, D.C. - Chiropractor

Claimant first saw Dr. Martinez on June 6, 2005 following a motor vehicle accident on May 31, 2005. **(Tr. 263)**. He complained of headaches, neck pain and right shoulder discomfort. Id. He was diagnosed with cervical sprain strain, cervical radiculitis, and cephalagia. **(Tr. 265)**.

Dr. Martinez's records include an MRI performed on August 1, 2005. **(Tr. 262)**. The report showed: straightening of the cervical spine, posterior bulging of the intervertebral discs at C2/C3 and C3/C4 causing impingement of the anterior thecal space at these levels, a posterior disc herniation at C4/C5 causing impingement of the ventral aspect of the spinal cord with an associated anterior disc herniation. A posterior herniated nucleus pulpous at C5/C6 was noted

---

[3] This injury occurred on January 26, 2004. **(Tr. 275)**.

as causing an impingement of the ventral aspect of the spinal cord. Id.  A posterior herniated

nucleus pulposus was found at C7/T1, causing impingement of the anterior thecal space.  Id.

His last visit was on December 16, 2005.  **(Tr. 260)**.  He still complained of pain and

restriction with associated tenderness and spasms.  Id.  He also complained of pain in his right

shoulder.  Id.  The doctor noted that Claimant's subjective complaints were substantiated by his

objective physical examination.  Id.  In sum, he concluded that Claimant was left with a residual,

permanent physical impairment of five (5) percent of the body as a result of the accident.  Id.

Steven Pearlstein, M.D. - Orthopedic Surgeon

Dr. Pearlstein evaluated Claimant on September 22, 2005. **(Tr. 282)**. He noted that

Claimant had midline and bilateral paracervical tenderness from the occiput to C7.  Id.

However, Claimant had a full range of motion on his right wrist and right shoulder.  Some

tenderness was observed in the dorsoulnar area.  Id.  Dr. Pearlstein diagnosed him with post-

traumatic cephalgis, cervical strain/sprain, disc herniations at C4-5, C5-6 and C7-T1, disc bulges

at C2-3 and C3-4, a right shoulder strain/sprain, and a wrist strain/sprain.  **(Tr. 282)**.  Based on

the above, he assigned Claimant an eight (8) percent impairment of the body as a whole.  Id.

Selwyn Carrington, M.D. - Primary Care Practitioner

Dr. Carrington wrote a letter for Claimant on November 15, 2007 in support of his claim

for disability.  **(Tr. 284)**.  The letter describes multiple herniated discs in Claimant's neck and

back, and further describes Claimant's diabetic neuropathy.  Id.

Samuel Rand, M.D. - Medical Consultant

Dr. Rand evaluated Claimant on June 2, 2008.  **(Tr. 312)**.  His primary complaints were

of back and neck pain, a herniated disc, diabetes, and hypertension.  Id.  He also complained that

he was unable to bend and that his left leg locks.  Id.  No paraspinous spasms of his spinal cord

or deformities were noted. **(Tr. 313)**. However, tenderness was observed on the lumbar sacral flexion at seventy degrees. Id. No signs of clubbing, cyanosis, or edema were noted. Id. There was also no evidence of deformity, swelling, or tenderness. Id. Claimant was able to grab a pen and sign his name without any difficulty. He was also able to go from sitting to standing without any problems. Id. Dr. Rand identified spondylolisthesis at L5/S1, but observed no scoliosis or arthritic changes. Id.

### Karen M. Wright - State Agency Consultant

On June 4, 2008, Karen M. Wright reviewed Claimant's records. **(Tr. 325)**. She reported that Claimant could occasionally lift and carry up to fifty pounds, and frequently lift and carry up to twenty-five pounds. **(Tr. 319)**. She noted that Claimant was also able to: stand and/or walk with normal breaks for about six hours in a workday, sit, and push and pull without limitations. Id. She found no evidence of bone or joint deformity, no swelling or tenderness, and no spinal cord spasms. Id. Some tenderness upon lumbosacral flexion was observed. Id. She concluded that Claimant can frequently climb ramps and stairs, and can occasionally climb ladders, ropes and scaffolds. **(Tr. 320)**. She further found that he can frequently stoop, kneel, crouch, or crawl, but can only balance occasionally. Id. In her view, his limitations are due to his back pain. Id. She found no manipulative, visual, environmental or communicative limitations. **(Tr. 321-22)**.

### L.A. Woodard, D.O. – State Agency Review Physician

Dr. Woodard, a state agency review physician, evaluated Claimant on September 29, 2008. **(Tr. 327)**. Dr. Woodard reported that Claimant could occasionally lift or carry up to fifty pounds, and frequently lift or carry up to twenty-five pounds. Id. Claimant could also stand and/or walk with normal breaks for six hours out of an eight-hour workday, sit for six hours out of an eight-hour workday, and push or pull without limitations. Id. He found that there was

little to no evidence of any severe, or even significant, issues. Id. For the most part, Dr. Woodard observed that Claimant was well-nourished and well-developed. **(Tr. 328)**.

In sum, he found that Claimant can frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds. Id. He can also frequently balance, stoop, kneel, crouch, and crawl. Id. Dr. Woodard concluded that Claimant had no manipulative, visual, environmental, or communicative limitations. **(Tr. 329-30)**. In other words, in his view, the alleged severity or effect of Claimant's alleged disability on his functioning appeared to be out of proportion when weighed against the totality of the evidence. **(Tr. 331)**. Along these same lines, Dr. Woodward found that several examining doctors had similarly conflicting conclusions as to Claimant's limitations. **(Tr. 332)**.

Eddy Carrillo, M.D. – General Surgeon

On October 10, 2008, Dr. Carrillo performed surgery to repair Claimant's left inguinal hernia **(Tr. 337)**.

Dr. Barry J. Cutler, M.D. - Neurologist

Claimant began treatment with Dr. Barry J. Cutler on January 20, 2009. **(Tr. 358)**. At the time, his main complaint was that he had numbness and weakness in his left fingers following an October 2008 hernia operation.[4] Id. The examination revealed that Claimant has ulnar neuropathy stemming from his left elbow as a result of diabetes and leaning on his elbow during the surgery. **(Tr. 359)**. Dr. Cutler ordered an EMG and nerve conditions, placed him in cubital tunnel syndrome splint, and set up occupational therapy. Id.

He visited Dr. Cutler twice in February 2009. **(Tr. 355-57)**. An EMG showed both ulnar and median nerve abnormalities suggestive of peripheral neuropathy. **(Tr. 357)**. The EMG also

---

[4] Following the 2008 hernia operation, Claimant failed to report any major neck pain, radicular pain, or left elbow pain. Id. He did, however, complain of headaches and dizziness. Id.

indicated bilateral ulnar neuropathies and carpal tunnel syndrome. **(Tr. 355)**.  Weakness was present in the ulnar-innervated musculature.  Id.  Dr. Cutler noted that Claimant's back had a good range of motion and no tender areas.  Id.

### Fidel H. Henriquez, M.D., F.A.C.E. - Endocrinologist

Dr. Henriquez evaluated Claimant on March 27, 2009.  **(Tr. 367)**.  Dr. Henriquez diagnosed him with Type II diabetes mellitus that is poorly controlled, dyslipidemia, hypertension, and neuropathy or mixed polyneuropathy.  **(Tr. 368)**.  The doctor gave him prescription medication and a glucometer.  Id.

### Melvyn Rech, D.O. - Orthopedic Surgeon

Claimant first saw Dr. Rech on April 29, 2010.  **(Tr. 424)**.  He presented with cervical and dorsal lumbosacral strain and sprain.  **(Tr. 425)**.  Dr. Rech observed that his cervical range of motion was restricted in all directions at approximately 15 to 20 degrees.  **(Tr. 424)**.  Claimant also presented with bilateral paravertebral muscle tenderness and spasm.  Id.  X-rays of the cervical lumbar and thoracic spine revealed a slight spondylosis.  **(Tr. 421)**.

On October 7, 2010, Claimant complained of radiating neck and lower back pain.  **(Tr. 419)**.  His cervical range of motion remained restricted.  Id.  He also had pain on extension in the upper extremities.  Id.  On June 14, 2011, Claimant again complained of continued cervical and lumbar pain.  **(Tr. 482)**.  Examination of the cervical region revealed that Claimant was slightly forward flexed and that his cervical motion appeared restricted.  Id.  Bilateral paravertebral muscle spasms, dorsal lumbar motion, and lower back pain were also present.  Id.  However, his deep tendon reflexes were intact.  Id.  He was treated with steroid injections to the lower back and paracervical region.  Id.  On September 8, 2011, Claimant presented with the same symptoms.

(Tr. 481).   Again, he received steroid injections.   Id.   A neurological consultation was recommended. Id.

After the ALJ determined that Claimant was not disabled, Dr. Rech completed a physical residual functional capacity (hereinafter, "RFC")[5] questionnaire. (ECF No. 25).  In it, Dr. Rech noted that Claimant's impairments could be expected to last at least twelve months.  Id.  He also noted that during a typical workday, he would frequently experience pain severe enough to interfere with the attention and concentration needed to perform simple work tasks.  Id.  He estimated that if Claimant were placed in a competitive work environment, that he could only sit or stand for thirty minutes at a time with normal breaks.  (Tr. 570).

In addition, he found that Claimant would need to take unscheduled breaks during the day.  Id.  Further, Claimant could only occasionally lift ten pounds or less, rarely lift or carry twenty pounds, and never lift or carry fifty pounds.  (Tr. 571).  He could only occasionally look down, turn his head, look up, or hold his head in a static position.  Id.  According to the assessment, Claimant could rarely twist, stoop, or climb ladders or stairs, and could never crouch or squat.  Id.  However, no significant limitations with reaching, handling, or fingering objects were noted.  Id.  In his view, the impairments are likely to produce several "bad days" and will likely cause him to be absent from work for more than four days per month.  (Tr. 571-72).  In light of this, he opined that Claimant needs a job that permits shifting positions at will from sitting, standing or walking. (Tr. 570).

Dr. Rech completed another physical RFC questionnaire on August 8, 2013.  (ECF No. 27).  He listed Claimant's symptoms as severe pain, numbness, and tingling lower extremities.

---

[5] A residual functional capacity or "RFC" is an assessment that identifies a claimant's impairments and related symptoms which may cause physical and mental limitations in a work setting. 20 C.F.R. § 416.945(a)(1).  A claimant's RFC is his or her ability to do work despite his or her impairments. 20 C.F.R. § 404.1545(a)(1).

Id. He also noted that Claimant can only occasionally lift five pounds or less; i.e. for one-third of an eight hour work day. **(ECF No. 27)**. He also stated that Claimant can rarely lift up to ten pounds (i.e. five percent of an eight-hour work day), and could never lift fifteen pounds or more. Id. This time, he estimated that if Claimant were placed in a regular, competitive work environment, he would not be able to walk one city block or more without rest. Id. Dr. Rech concluded that Claimant would have problems with balance when ambulating, as well as problems with stooping, crouching, and bending. Id. Because of this, Claimant would have to lie down and/or recline for approximately four hours out of an eight hour workday. Id.

He further found that Claimant does not have the ability to push and pull arm or leg controls from a sitting position for six or more hours per 8-hour work day. **(ECF No. 27)**. He is also unable to climb stairs, ladders, scaffolds, ropes or ramps. Id. Again, he found that Claimant is likely to be absent from work for approximately five days or more out of the month. Id. In his opinion, Claimant's severe pain would interfere with his ability to concentrate on simple work tasks. Id. In other words, Claimant would be "off-task" for more than thirty percent of an eight-hour work day. Id.

Giovana Rene, D.O. - Primary Care Doctor

Dr. Rene diagnosed Claimant with benign essential hypertension and Type II diabetes mellitus On June 1, 2010. **(Tr. 462)**. On August 3, 2010, he was treated for an ulcer on his ankle. **(Tr. 453)**. He presented with a one inch, superficial ulcer located on the lateral of right ankle. Id. He was diagnosed with cellulitis. **(Tr. 454)**.

A few weeks later, on August 25, 2010, Claimant complained of an ankle abrasion. **(Tr. 451)**. He also complained of erectile dysfunction and back pain. **(Tr. 451-52)**. By that time, his foot lesion healed and scarred. **(Tr. 452)**.

On June 13, 2011, Dr. Rene noted a mild exacerbation of Claimant's hypertension. **(Tr. 436)**. The doctor also noted inadequate control of Claimant's diabetes. Id. On August 23, 2011, Claimant was treated with steroid injections for pain management. **(Tr. 435)**. He was also diagnosed with esophageal reflux. Id.

Kenneth Sabacinski, D.P.M. - Podiatrist

Dr. Sabacinski first treated Claimant for brittle toenails on September 23, 2010. **(Tr. 474)**. The doctor debrided and applied antiseptic solution to Claimant's toes. Id. Claimant continued treatment with this provider.

Memorial Hospital, Miramar

On October 25, 2010, Claimant underwent an MRI of the lumbar spine at Memorial Hospital. **(Tr. 413)**. Grade I anterolisthesis was present at the L5-S1 level, as well as bilateral spondylosis, disc space narrowing with an element of disc desiccation, and a bulge/exposed disc. Id. Mild facet joint degenerative change was also noted. Id. At the L4-5 disc level, the central canal showed mild stenosis, but the L3-4 disc level was unremarkable. Id. There was a protrusion at the L2-3 disc. Id. At the L1-2 disc level, there was an extrusion extending posterior to the inferior aspect of L1 and impressing the anterior aspect of the thecal sac. **(Tr. 414)**. Impingement was noted on the C8 nerve. **(Tr. 416)**. A disc protrusion was noted at the T3-4 level, and a disc bulge was noted at the T2-3 level. Id. At the C5-6 level, there was a central disc protrusion effacing the anterior subarachnoid space. **(Tr. 380)**. There was no compromise of the spinal cord, but there was a mild disc bulge and narrowing of the intervertebral foramina. Id. At C6-7, a disc bulge partially effaces the anterior subarachnoid space. **(Tr. 493)**. There was no acute cord abnormality, and no soft tissue swelling. Id. **(Tr. 382)**.

<u>Allan Rubin, D.O. - Ophthalmologist</u>

Claimant was first treated by Dr. Rubin, an ophthalmologist, on November 17, 2010. **(Tr. 411)**. Visual field tests were abnormal in both eyes. Both eyes showed inferior nerve fiber bundle defects.

<u>Maury A. Jayson, M.D. - Urologist</u>

Claimant was first treated by Dr. Jayson on December 22, 2010 for erectile dysfunction, hypogonadism, and a prostate evaluation. **(Tr. 518)**. During the visit, Claimant complained that he has a diminished libido, and difficulty in achieving and maintaining an erection. <u>Id.</u> Dr. Jayson noted the following issues: urinary frequency, diabetes mellitus, hypertension, impotence of organic origin and decreased libido. <u>Id.</u> He concluded that Claimant has predisposing factors which include: diabetes, hypertension, neurologic disease, and neuropathy. <u>Id.</u>

<u>Ronald D. Kaplan, D.O. - Osteopathic Physician</u>

On March 21, 2012, Dr. Kaplan performed a consultative examination of Claimant. **(Tr. 563)**. Claimant appeared wearing a hard shell brace given to him by his orthopedist), an elbow brace on his left elbow (given to him by Dr. Cutler), and an Aspen collar (given to him by Dr. Rech). **(Tr. 565)**. Upon examination, Dr. Kaplan noted that Claimant can ambulate with a somewhat wide-based gait and minor instability. <u>Id.</u> He found that Claimant is in the 2/5 range on motor testing with decreased compliance. <u>Id.</u> He also found that Claimant's efforts were inconsistent with some basic activities such as ambulation and getting on and off the examination table (which he was able to do). <u>Id.</u> No cervical spine pain was noted. <u>Id.</u>

The doctor further noted that Claimant's grip strength was inconsistent with his ability to push himself off the examination table without evidence of atrophy. <u>Id.</u> He diagnosed Claimant

with multiple traumas associated with prior motor vehicle accidents, including degenerative disc disease of cervical spine, and lumbar degenerative disc disease and ulnar neuropathy. **(Tr. 566)**.

The doctor concluded that Claimant can frequently lift and carry up to ten pounds, can occasionally lift and carry between eleven and fifty pounds, but can never lift or carry over fifty pounds. **(Tr. 558)**. He can sit up to three hours at a time without interruption, and can stand and walk for up to one hour without interruption. **(Tr. 559)**. During an eight-hour workday, he can sit for a total of five hours, and can stand and walk for a total of two hours, respectively. Id. He does not require a cane to ambulate. Id. Claimant can frequently[6] reach overhead, handle, finger, feel, and push or pull objects with his dominant right hand. **(Tr. 560)**. With his left hand, he can only occasionally[7] reach overhead; however, he can frequently reach, handle, finger, feel, and push or pull objects. Id. He can occasionally climb stairs, ramps, ladders, or scaffolds. **(Tr. 561)**. Dr. Kaplan was unable to assess Claimant's balance or ability to stoop, kneel, crouch, or crawl because he refused to attempt such activities. Id. He also refused to retrieve objects from the floor, and refused to sit or squat. **(Tr. 565)**.

In sum, Dr. Kaplan concluded that Claimant can never be exposed to unprotected heights. **(Tr. 562)**. However, he can occasionally be exposed to moving mechanical parts, motor vehicle operation, humidity and wetness, dust odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations. Id. He concluded that Claimant is best suited for an environment with moderate noise level, such as an office. Id. In this connection, Claimant can participate in activities such as: shopping; traveling without assistance; walking a block at a reasonable pace on rough or uneven surfaces; using standard public transportation; climbing a few steps at a

---

[6] Frequently refers to one-third to two-thirds of an 8-hour work day. **(Tr. 558)**.

[7] Occasionally refers to up to one-third of an 8-hour work day. **(Tr. 558)**.

reasonable pace with the use of a hand rail; preparing simple meals and feeding himself; caring for his personal hygiene; sorting, handling, and using paper; and walking without using a wheelchair, walker, cane, or crutches. **(Tr. 563)**.

### Claimant's Testimony

As indicated above, Claimant testified at the hearing on February 27, 2012. **(Tr. 48)**. His testimony is as follows. He is 5'6, and weighs 180 pounds. **(Tr. 65)**. He has lived in the United States for thirty (30) years. **(Tr. 48)**. He currently lives with his wife, his mother-in-law, and his two adult children. Id. He has a driver's license. **(Tr. 36)**. At the hearing, he claimed to speak little English and requested a translator. **(Tr. 48)**. However, because Claimant did not use a translator at his doctors' appointments, the ALJ questioned his request. **(Tr. 52)**.

He testified that his wife is the only source of household income. **(Tr. 54)**. His last job was in July 2004 doing maintenance and cleaning. **(Tr. 53)**. His duties included pressure washing buildings and areas surrounding the pool. Id. He stopped working after he suffered a work-related injury. Id. He received Worker's Compensation payments after the accident; however, the payments have since ceased. **(Tr. 54)**. Claimant also stated that he received compensation as a result of an automobile accident. Id.

He frequently feels pain in his back and that he cannot do anything. Id. He has trouble sleeping due to the pain. Id. He also has pain in his neck and left leg, as well as numbness in his left arm. Id. He exercises by forcing himself to pick up items with his left arm and reach them over his head; however, this causes him a lot pain. **(Tr. 56)**. He claims that he runs on a treadmill when his legs feel heavy. Id. He tries to make his bed, although sometimes he is unable to do so. Id.

15

He wears a brace on his left arm that was prescribed to him by Dr. Cutler after a hernia operation.  Id.  He also claims that he has pain in his left foot and can only stand for about fifteen to thirty minutes before it becomes heavy and hot.  **(Tr. 57)**.   Further, he can only sit for about twenty to thirty minutes before he begins to experience heaviness and his left side becomes numb.  Id.  In his view, he can lift no more than fifteen pounds and next to nothing with his left arm.  Id.  In fact, he testified that he cannot even hold a towel to dry himself.  Id.

He takes diabetes medication and receives steroid injections every two months in his lower back.  **(Tr. 55)**. These treatments only provide temporary relief.  Id.  He claims that he gets dizzy and feels as if he has sand in his eyes when his blood sugar levels are high. **(Tr. 58)**.  He believes that the pain injections increase his sugar levels and aggravate his diabetes symptoms. Id.

He testified that he visited the hospital on December 2, 2011, in connection with treatment for a heart infection.  **(Tr. 59)**.  He claims that the doctor told him that it was a very serious situation. Id.  He also claims that he has trouble with his eyes and is unable to see well. Id.  Lastly, Claimant testified that he has trouble concentrating when he starts a task.  Id.

### **Vocational Expert's Testimony**

At the hearing, the VE testified as to Claimant's prior employment.  **(Tr. 60)**.  He described Claimant's past relevant work as being a commercial industrial cleaner and a dishwasher/kitchen helper.  **(Tr. 62)**.  These occupations are listed in the Directory of Occupational Titles ("DOT") as "commercial industrial cleaner" Code 381.687-014, which is classified as heavy work, SVP 2; and as "dishwasher/kitchen helper" Code 318.687-010, which is classified as medium work, SVP 2.  Id.

The ALJ presented the following hypothetical to the VE:

> Assume a hypothetical claimant with the same age, background, and education as this claimant. Assume that such person could perform light work, with no repetitive lifting of more than twenty (20) pounds that could occasionally climb ladders, ropes and scaffolds.

**(Tr. 63)**.

The ALJ asked the VE whether such a hypothetical claimant could perform Claimant's past relevant work. **(Tr. 63)**. In the VE's view, the hypothetical claimant could not. Id. He noted, however, that there are other jobs that the subject Claimant could perform. Id. For example, he could work as a cafeteria attendant, a housekeeper in a hotel and/or motel, or a silverware wrapper in a restaurant. Id. Each of the above-named jobs is listed as "light work" in the DOT Code. Id. Such job positions are available throughout the state and country. Id.

The ALJ then asked the VE whether his answer to the hypothetical question would change if the claimant could not use repetitive fingering due to loss of feeling in his hands. Id. In the VE's view, loss of feeling is not typically debilitating; housekeeping, housecleaning, and cafeteria attendant positions require only occasional fingering. **(Tr. 64)**.

The ALJ posed another hypothetical question, namely, what would happen if the claimant were limited to sedentary work with only occasional climbing and no repetitive fingering or feeling. Id. In his opinion, no such job would exist because sedentary work would require an individual to have the capacity to manipulate objects by hand. Id. Finally, Claimant's counsel posed the following hypothetical facts to the VE, i.e., the claimant would be unable to focus for 10-20 percent of the day due to pain. **(Tr. 65)**. The VE responded that the hypothetical claimant could not do the work because such individual would only be working for two-thirds of the day. Id.

17

**Standard of Review**

The Social Security Administration regulations, utilized by the ALJ, provide a five-step sequential evaluation process to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).   In step one, the ALJ determines whether the claimant is engaging in "substantial gainful activity."   § 404.1520(a)(4)(1).   If an individual engages in substantial gainful activity, he or she is not disabled.  If not, the evaluation continues to the next step.

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments.  § 404.1520(a)(4)(ii).  If the claimant does not have a medically severe impairment or combination of impairments, he or she is not disabled. Id. If the impairment or combination of impairments is severe, the evaluation proceeds.

At step three, the ALJ determines whether the claimant's impairment, or combination of impairments, meets or medically equals the criteria of an impairment listed in § 404.1520(d), subpt. P, app. 1. Certain impairments are so severe by nature that, if established, the ALJ must find that the claimant is disabled without further inquiry.  Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the claimant's impairment or combination of impairments meets or medically equals a listed impairment, the claimant is automatically disabled and the evaluation ceases.  § 404.1520(d). If the claimant's impairment or combination of impairments does not meet the criteria, then the ALJ assesses the RFC based on all the evidence.  § 404.1520(e).

At step four, the ALJ assesses the claimant's RFC and determines if the claimant can perform his or her past relevant work.  § 404.1520(a)(4)(iv).   In making this finding, the ALJ must consider all of the claimant's impairments, including ones that are not severe.   §

404.1520(e). Past relevant work encompasses work performed within the last fifteen years or fifteen years prior to the date that disability was established. If the claimant is able to perform past relevant work, he or she is not disabled. Id. If the claimant is unable to perform past relevant work, the evaluation continues. At step five, the ALJ determines whether the claimant is able to do any other work in the national economy considering his or her RFC, age, education, and work experience. § 404.1520(a)(4)(v).

The burden is on the claimant to prove that he or she is unable to perform past relevant work and that the impairment(s) is so severe that he or she cannot engage in any substantial gainful activity in the national economy. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A) (2012); Freeman v. Barnhart, 220 F. App'x 957, 959-60 (11th Cir. 2007). Along these lines, the inability to perform previous work relates to the type of work performed, not merely to a specific prior job. Jackson v. Bowen, 801 F.3d 1291, 1293 (11th Cir. 1986).

Judicial review of the ALJ's determination under 42 U.S.C. § 405(g) is limited to whether there is substantial evidence in the record to support the decision and whether the correct legal standards were applied. Moore v. Barnhart, 405 F.3d 12058, 1211 (11th Cir. 2005). Substantial is more than a scintilla of evidence, but less than a preponderance, and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. Id. Even if the Court finds that the evidence preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. Levie v. Comm'r of Soc. Sec., 514 F. App'x 829, 830 (11th Cir. 2013).

The court must view the record as a whole, "taking into account evidence favorable as well as unfavorable to the Commissioner's decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th

Cir. 1995).  When reviewing a case, the court "may not reweigh evidence and decide facts anew, and must defer to the ALJ's decision if it is supported by substantial evidence."

Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  Grounds for reversal include a failure by the ALJ to apply the correct legal standards or to provide the court with sufficient reasoning to show that the correct legal standards were used.  Cornelius v. Sullivan, 96 F.2d 1143, 1145-56 (11th Cir. 1991).

### ALJ's Findings

After the hearing, the ALJ issued an unfavorable opinion on July 13, 2012. **(Tr. 13)**.  By way of summary, he found that Claimant had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, diabetes mellitus, hypertension, obesity, and ulnar neuropathy. **(Tr. 15)**.  The ALJ concluded, however, that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  Id.  For example, the ALJ found that Claimant's carpal tunnel syndrome was not severe.  Id.

The ALJ also determined that Claimant has the RFC to perform light work.[8]  In this connection, he found that Claimant can occasionally climb ladders, ropes, and scaffolds, but cannot perform repetitive lifting of more than twenty (20) pounds.  Id.  Further, the ALJ found that the RFC assessment is supported by medical and nonmedical evidence. **(Tr. 21)**.

---

[8] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. This job category may require walking or standing, or sitting with some pushing/pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b) and § 416.967(b).

In sum, the ALJ concluded that Claimant is unable to perform his past work. **(Tr. 22)**. However, after consideration of Claimant's age, education, work experience, and RFC, he determined that there are jobs that Claimant can perform that exist in significant numbers in the national economy. **(Tr. 23)**. As an example, the ALJ noted that Claimant could work as a cafeteria attendant, housekeeper, or silverware wrapper. Id. Accordingly, the ALJ found that Claimant had not been disabled, as defined in the Social Security Act, from July 16, 2004, through the date of his decision. Id.

## Analysis

### The ALJ Properly Considered and Weighed the Opinion of Dr. Kaplan

Here, Claimant argues that the ALJ erred in determining that he can perform a full range of light work, a finding contrary to the opinion of Dr. Kaplan, a consultative examiner. He specifically argues that, as per Dr. Kaplan's assessment, he cannot perform light work because he cannot stand or walk for a long period of time, and can only sit for three hours before taking a break. **(Tr. 559)**. In this connection, he argues that since he cannot perform light work, he also cannot perform sedentary work. **(ECF No. 27)**. In short, Claimant contends that he lacks the ability to perform all of the activities that accompany light work. **(ECF No. 24)**. This argument fails to persuade. Here, as noted by Defendant, "the ALJ, who otherwise gave great weight to [Dr. Kaplan's] opinon, gave good reasons, supported by substantial evidence, for discounting [his] statement about [Claimant's] ability to stand and walk." **(ECF No. 25)(Tr. 20-21)**.

The ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). With good cause, an ALJ may even disregard a treating physician's opinion, but he must clearly articulate the reasons for doing so. Phillips v. Barnhart, 357 F.3d 1232, 1240 no. 8 (11th Cir. 2004).

As explained in the Regulations,

The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. § 404.1527( c) (3)

In other words, the ALJ will consider the relationship between the claimant and the physician, what support, if any, is offered by the physician for his/her opinion, and how consistent said evidence is with the record as a whole.  20 C.F.R.  § 404.1527 (c).

Here, substantial evidence supports the ALJ's decision to discount the portion of Dr. Kaplan's opinion wherein he finds that Claimant could stand and walk for only two hours  in an eight-hour workday.  **(Tr. 21)**.     In this connection, the ALJ clearly articulated reasons for discounting same.  **(Tr. 21)**.  For example, the ALJ properly noted that the physical limitations listed in Dr. Kaplan's medical source statement were inconsistent with Claimant's behavior during his examination.  See Hunter v. Colvin, No. 7:13-CV-2142-VEH, 2015 WL 770432, at *5 (N.D. Ala. Feb. 24, 2015) (finding that the doctor's opinion that the claimant was disabled was inconsistent with the doctor's own examination of the claimant).

Specifically, in his examination report, Dr. Kaplan noted that Claimant did not exert much effort, and exaggerated his ability to walk and move his arms.  **(Tr. 559)**.  He also noted that Claimant ambulated unsteadily but was able to correct himself without difficulty.  **(Tr. 565)**.  Claimant was also able to hold items and push himself off of the examining table with no evidence of atrophy.   Id.  It also bears noting that Claimant was noncompliant throughout the

examination, refusing to squat or attempt to squat, and declining to pick up any objects from the floor. Id. Further, the doctor noted that Claimant wore a brace on his left side even though his elbow range motion was completely normal. Id. Despite his own observations, however, Dr. Kaplan reported Claimant's ulnar neuropathy and grip strength as 2/5, or, in other words, essentially absent. Id.

Further, MRI reports support a contrary finding than that of Dr. Kaplan's assessment. To illustrate, Claimant's MRI showed only "mild impingement on the lumbar and cervical spine." **(Tr. 21, 565-68)**. Even with a mild impingement on the lumbar and cervical spine, Claimant demonstrated no evidence of atrophy in any extremity and only a small amount of lumbar discomfort. **(Tr. 565)**. In other words, the MRI results directly contradict and discredit Dr. Kaplan's findings that Claimant cannot stand or walk for any extended period of time.

Thus, the ALJ properly found that the record fails to support a finding of disability to the extent described by Dr. Kaplan. See, e.g., Majkut v. Astrue, 8:07-CV-1828-T-MCR, 2009 WL 860623, at *11 (M.D. Fla. 2009), aff'd sub nom. Majkut v. Comm'r of Soc. Sec., 394 F. App'x. 660 (11th Cir. 2010) (finding that although the claimant had a mild impingement of the spine, there was no testimony that medically equals the severity of one of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P).

In sum, good cause existed for the ALJ to discredit the noted portion of Dr. Kaplan's opinion. See Edwards, 927 F.2d at 583-84. Accordingly, the undersigned finds that substantial evidence supports the ALJ's decision. In light of same, the ALJ's determination that Claimant can perform light work,[9] despite his impairments, is proper and should not be overturned.

---

[9] The ALJ determined that Claimant can perform light work, with the additional limitation that he cannot perform repetitive lifting of more than twenty pounds and can only occasionally climb ladders, ropes, and scaffolds. **(ECF No. 25)**.

**The Appeals Council Properly Concluded Claimant's "New Evidence" did not Provide a Basis for Overturning the ALJ's Decision**

Claimant argues that the Appeals Council failed to carefully consider Dr. Rech's opinion in deciding whether to grant further review of the ALJ's decision. **(ECF No. 24)**. According to Dr. Rech's RFC evaluation, Claimant can perform neither sedentary nor light work, and therefore, is disabled. Id. Thus, Claimant argues that any findings based on the December 7, 2011 MRI constitute an inaccurate representation of his current condition, because said MRI was performed eight and a half months prior to Dr. Rech's August 2012 RFC evaluation. **(ECF No. 27)**. Defendant, on the other hand, argues that the Appeals Council properly considered the additional evidence and that same was not contrary to the ALJ's ultimate finding. Along these same lines, Defendant contends that Dr. Rech's post-decision opinion is inconsistent with the medical evidence, as well as his own treatment notes.

A claimant may present new evidence at each stage of the administrative process. Ingram v. Comm'r of Soc.Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007). In determining whether to grant review of an ALJ's decision, the Appeals Council is required to consider the entire record, including new evidence. See 20 C.F.R. § 404.970(b). Specifically, the Appeals Council must consider evidence that is: new, material, and chronologically relevant. Ingram, 496 F.3d at 1261.

New evidence is considered "material" if it is relevant, probative, and capable of eliciting a reasonable possibility that its consideration would change the administrative result. Id. ; See Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987) (finding that new evidence obtained after the ALJ's hearing was immaterial because it would not have changed the hearing's outcome); Mitchell v. Comm'r of Soc. Sec., 771 F.3d 780, 784 (11th Cir. 2014). New evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing

24

decision." <u>Watkins v. Astrue</u>, 925 F. Supp. 2d 1257, 1258 (N.D. Ala. 2013) (citing 20 C.F.R. 404.970(b)); <u>see also</u> <u>Bell v. Colvin</u>, No. 4:14-CV-523-RDP, 2015 WL 4656362, at *16 (N.D. Ala. Aug. 6, 2015) (finding that new evidence which occurred after the ALJ hearing date was not relevant or material).   When a claimant properly presents new evidence to the Appeals Council, the reviewing court must consider whether that new evidence renders the denial of benefits erroneous.  <u>See</u> 42 U.S.C.A. § 405(g).

Here, Dr. Rech's RFC later  RFC is immaterial because the evaluation occurred after the ALJ's hearing, and would not have changed the result.  <u>See</u> <u>Bell</u>, No. 4:14-CV-523-RDP, 2015 WL 4656362, at *16.   Even so, the Appeals Council carefully reviewed the additional evidence and concluded that same did not render the ALJ's findings and conclusion erroneous.  **(ECF No. 25)**.   The Notice of Appeals Council Action states in relevant part,

> Although the claimant's treating source, Dr. Melvyn Rech,  indicated that the claimant would not be able to work, this opinion is inconsistent with the medical evidence of record in this case, as well as Dr. Rech's treatment notes found in exhibit 26F.

**(Tr.2)**.

As  correctly noted by Defendant, most of Dr. Rech's own notes contain little more than Plaintiff's own subjective complaints, and are lacking in evaluation findings. In fact, Dr. Rech's treatment notes tend to support the ALJ's findings.   By contrast,    Rech's more recent RFC remains unsubstantiated by any medical findings.     Further, the   August 2012 RFC merely consists of checked boxes with virtually no information elaborating on the supposed new evidence.  **(Tr. 569)**.    In other words, no explanation or supporting medical evidence was provided.  As such, a  finding of disability based on same does not logically follow.  <u>See, e.g.</u>, <u>Burgin v. Comm'r of Soc. Sec.</u>, 420 F. App'x 90, 9031 (11th Cir. 2011) (giving little weight to the conclusions in an RFC questionnaire because it merely consisted of items checked on a

survey with no supporting explanations); <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997) (finding that a treating physician's opinion does not have to be given substantial or considerable weight if it is conclusory).

Further, as noted by the ALJ, the mild MRI findings simply fail to support the extreme limitations noted in Dr. Rech's RFC.   For example, radiologist Michael Roberts, M.D., compared Claimant's MRIs from 2010 to 2011 and found that "no definite change" existed. **(Tr. 567)**.  In other words, the MRIs revealed no acute abnormality of the spinal/ lumbar cord. **(Tr. 22)**.

In sum, Dr. Rech's treatment notes reflect only conservative treatment options such as physical therapy, home exercises, ice packs and heating pads, and steroid injections to the lower back. **(Tr. 19)**.   Such treatment options/plans are inconsistent with a finding of a complete inability to work.

For these reasons, the undersigned finds no error.

### Conclusion

Consistent with the above, and upon careful consideration of the record, the undersigned concludes that the ALJ's findings are supported by substantial evidence. Accordingly, it is hereby **RESPECTFULLY RECOMMENDED** that Claimant's Motion for Summary Judgment **(ECF No. 24)** be **DENIED** and Defendant's Motion for Summary Judgment **(ECF No. 25)** be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objectives, if any, with the Honorable Darrin P. Gayles, United States District Judge for the Southern District of Florida.  Failure to file objections timely shall bar the parties from attacking on appeal the factual

findings contained herein.  Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488

U.S. 958 (1988); R.T.C. v. Hallmark Builder, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this ___ day of

August 2016.

_____
**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:     Hon. Darrin P. Gayles
        Counsel of Record